IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| STARLIGHT GROUP, LLC, <br><br> *Debtor*, | |
| MICHAEL DORULA, ROBERT MELETTI, and JULIE MELETTI, <br><br> *Appellants*, <br><br> v. <br><br> WILLIAM BROOKS and CHARLES M. FLOURY, <br><br> *Appellees*. | Civil Action No. 1:16-cv-622 <br> Appeal from United States <br> Bankruptcy Court, Eastern District <br> of Virginia <br> Case No.:11-18241 |

## Memorandum Opinion

This matter comes before the Court on Appellants Michael Dorula, Robert Meletti, and Julie Meletti's appeal from the Bankruptcy Court's Memorandum Opinion dated May 20, 2016. Dkt. No 1, Exh. 2. The appeal has been fully briefed by the parties. Dkt. Nos. 10, 12, 13. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. 158(a)(1). For the reasons discussed herein, this Court AFFIRMS the decision of the Bankruptcy Court.

### I. Background

#### A. Factual Background

This case arises out of the Chapter 7 bankruptcy of Starlight Group, LLC, a real estate investment entity formed by Spencer Brand in 2004. Brand formed Starlight in order to solicit investments to purchase residential real estate in Northern Virginia and resell it for a profit. The

1

venture had some early success, which led a number of investors to make loans to Starlight. Those investors included Appellees William Brooks and Charles Flory, who made loans to Starlight in May 2005. The arrangement with Brooks and Flory provided that they could get their original investment back, plus ten percent interest, after three years. However, the loans were not secured by any of Starlight's properties or assets. By 2007, the market had changed and Starlight had accumulated a large amount of debt owed to investors and mortgage companies. It also had on hand a number of properties that it was unable to sell for a profit. Brooks and Flory became aware at that time that the investments were losing money, but did not take action to withdraw their funds.

When the three years were up in 2008, Brooks and Flory asked Brand to return their original investment. Their attorney, Ronald L. Eakin, wrote a demand letter to Starlight on April 28, 2008. Brand informed them that he did not have the money to repay their loans and explained that he was losing money and that the Starlight business was "bleak." Over the next two years, Brooks and Flory claim to have repeatedly inquired about the state of Starlight, and Brand acknowledged one social encounter in January 2009, but Brooks and Flory took no further steps to recoup their money.

In early 2009, Brand began working with Greg Holmes, a realtor, to create a new and hopefully profitable business model. The new model revolved around short-sales of homes; Brand offered to use Starlight (what he described to Holmes as his "defunct" LLC) as the buyer, and in return Starlight would receive somewhere between ten and fifty percent of any profit from the sales—the precise amount of which was disputed by Brand and Holmes. The enterprise was essentially run by Holmes, with Brand appearing at closings and as necessary to facilitate the purchase of the properties. Soon, Holmes recognized the need for more capital and he contacted

Dorula, an accountant, who helped him line up investors (which included the Melettis). Brand pitched Dorula on the success of the Starlight project to encourage further investment.

The Holmes/Starlight enterprise signed on a number of new investors; the investors received interest at a rate of 15% monthly, and their loans were secured by a lien on all of Starlight's assets, including its properties. Although the loans *were* secured (as opposed to Brooks and Flory's unsecured loans), they were never perfected. Within the first two years of this arrangement, Starlight incurred over $2 million in debt. Starlight ended up recording a small profit in 2008, and, after accounting for consultancy fees paid to Holmes and Brand, losses in 2009 and 2010. By 2011 it owed its investors $3.4 million. Starlight's financial issues were compounded by Brand's misuse of the funds. Brand used the secured creditors' funds for personal expenses and also used them to day-trade on the stock market.

In 2010, Brand approached Brooks and Flory about resolving their claims (which totaled just over $1 million combined). By this point, all of the other "first wave" investors had given up on recouping their money. He offered them $200,000, paid in $833.33 monthly installments, secured by a Starlight property and guaranteed by Brand personally. Brooks testified that Brand told him that they would never get anything if they didn't take this agreement, and Brooks stated that he figured "something is better than nothing." After some negotiations (during which Brooks and Flory were represented by counsel), Brooks and Flory entered into a Settlement Agreement with Brand and Starlight on June 25, 2010. The brief agreement and states that "whereas Starlight and Northstar have been unable to meet their monthly and final payment obligations, and will be unable to do so in the future." At the time Brooks and Flory signed the agreement, Starlight showed a negative balance on its general ledger. At that time Starlight's

bank account contained $652,291.60. Brand honored the Settlement Agreement, and never missed a monthly payment.

In November 2011, Starlight, LLC filed for Chapter 7 bankruptcy. Brand's personal bankruptcy followed in January 2012. Brooks and Flory filed Proof of Claims (POCs) in the Starlight bankruptcy for the original, full value of their investment in Starlight. They argued that they were induced to enter the settlement agreement by Brand's fraudulent representation that Starlight was "unable to meet [its] monthly and final payment obligations, and will be unable to do so in the future." They argue that Starlight was actually a thriving business that could have paid their claims, and that Brand lied to them by implying that Starlight was shutting down operations in spring 2010 during the settlement negotiations. Appellants are secured creditors of Starlight from the "second wave" of the business, and they objected to Brooks and Flory's POCs, requesting that they be limited to the amount of the Settlement Agreement they signed with Starlight in 2010.

### B. Procedural Background

On February 25, 2013, the Appellants filed objections to the POC's of the Appellees in the Chapter 7 Bankruptcy Case of Starlight Group, LLC. The bankruptcy court held two days of evidentiary hearings on the Brooks and Flory POCs, and overruled the Appellants' objections finding that Brand had obtained a novation of Brooks and Flory's claims by constructive fraud. The Appellants appealed the Bankruptcy Court's ruling and this Court remanded to the Bankruptcy Court on January 31, 2014 for further findings of fact related to the constructive fraud ruling.

On October 21, 2014, the Bankruptcy Court issued an opinion in favor of Appellees on the basis of additional arguments in May of that year. The Bankruptcy Court held that Brand had

obtained the novation by constructive *and* actual fraud. Again, Appellants appealed this finding and on February 20, 2015, the Court again remanded the case to the Bankruptcy court for further findings on five specific factual questions which the Court felt were insufficiently developed in the prior proceedings.

On September 10, 2015, the Bankruptcy court held a day-long trial including testimony and the submission of additional evidence. On May 20, 2016, the Bankruptcy Court issued an opinion finding that Brand had committed actual fraud and constructive fraud in obtaining the novation and specifically addressed the questions presented by this Court on remand. On July 6, 2016, Appellants instigated the present appeal.

## II. Standard of Review

The Court reviews the Bankruptcy Court's legal conclusions *de novo* and factual findings for clear error. *E.g.*, *IRS v. White*, 487 F.3d 199, 204 (4th Cir. 2007). "Any mixed questions of law and fact are also reviewed de novo." *In re Litton*, 330 F.3d 636, 642 (4th Cir. 2003). Findings of a bankruptcy judge are afforded the same weight given to a district judge under Rule 52 of the Federal Rules of Civil Procedure so questions of a purely factual nature are subject to review under a "clearly erroneous" standard. Fed. R. Bankr. P. 8013. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Easley v. Cromartie*, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). "When findings are

based on determinations regarding the credibility of witnesses," the Court gives "even greater deference to the trial court's findings." *Id.* at 575, 105 S.Ct. 1504.

### III. Issues on Appeal

On remand, the Court instructed the Bankruptcy Court to conduct further review on five specific questions. *See* Civil Action No: 14-cv-1660, Dkt. No. 8, at 8-9. As the Court remanded this matter for insufficient evidence of fraud based on these particular areas of ambiguity, the Court focuses its analysis on those issues presented to the Bankruptcy Court for further review.

1) whether the balance in Starlight's ledger for June 25, 2010 was $652,291.60 or negative $245.00;

2) why the SunTrust account balance is a more accurate gauge of Starlight's ability to pay Brooks' and Flory's claims, as opposed to the balance in its general ledger;

3) whether the amounts claimed for "Other Expenses" on Starlight's 2009 and 2010 tax returns represented Brand's and Holmes' profits. This will require inquiry into Brand's personal tax returns for those years;

4) whether security agreements were in place covering Starlight's assets on June 25, 2010;

5) whether Brand knew or should have known that the security agreements with new lenders did not give them priority over Brooks and Flory as to Starlight's assets.

All of the questions, excluding question two, are purely factual in nature and are therefore reviewed under a "clearly erroneous" standard.[1]

### IV. Analysis

---

[1] The one question that is not purely factual, question two, is not a basis for reversal under any standard of review as the parties have agreed with the findings of the Bankruptcy Court. *See* Dkt. No. 8, Designated Record (hereafter "D.R.") at 212 n. 37.

6

The Court has considered the additional evidence offered for each of the five questions presented to the Bankruptcy Court and found that the findings of the Bankruptcy Court are well reasoned and supported by the evidence. In their briefing papers, Appellants have not responded directly to the Bankruptcy Court's findings on these five specific questions—challenging the Bankruptcy Court's determination only on questions one, three and five, and then only in their reply brief after the Appellees addressed the questions specifically in their briefing. With respect to the unanswered questions two and four, Appellants have offered little basis from which the Court could find that the Bankruptcy Court's answers to the questions were clearly erroneous. Identifying no basis in the record on its own to find those uncontested findings clearly erroneous, the Court adopts the Bankruptcy Court findings with respect to questions two and four.

With respect to question one, Appellants acknowledge that the Bankruptcy Court's factual findings are correct but challenge whether those findings are helpful in understanding the debtor's financial situation, state of mind and what a reasonable person might have believed concerning Starlight's ability to pay the claims of Brooks and Flory. Dkt. No. 13 at 10. While the Court recognizes the fluctuations in the Starlight bank account around the date of the settlement, the other facts in evidence illustrate that Brand routinely withdrew money from the account, despite the fluctuating balances, when he felt it important to do so. Between December 2009 and the time Brand offered the Settlement Agreement, Brand had transferred $50,000 from Starlight's checking account to his stock account. D.R. at 202. Brand also withdrew money directly from the Starlight accounts to pay for his daughter's wedding. *Id.* at 152. When pressed on this subject during examination by Appellees' counsel, Brand contended that he was justified in the withdrawals from Starlight because "there were lots of monies lost in all sorts of different ways, both by Greg and myself. *Id.* at 154. While Brand may have hoped to avoid withdrawals

from the Starlight account which he felt were unnecessary, unjustified, or might expose his ongoing liabilities and thereby jeopardize his arrangement with Holmes; given the evidence of Brand's willingness to pay himself, his wife or others directly from the Starlight account when it seemed appropriate to him, the Court is not persuaded by Appellants' argument that Brand was of the state of mind that he could not pay Brooks and Flory anything more than the offered Settlement Agreement.

With respect to question three, the Bankruptcy Court conducted an analysis of Brand's Schedule C "Profit or Loss from Business" from 2009 and 2010 finding that the majority of the "Other Expenses" were itemized as consulting fees paid to Holmes, Brand and their wives. *Id.* at 212-13. Appellants contend that this factual finding is immaterial because the end of year earnings do not indicate Brand's state of mind at the time the Settlement agreement was reached and the Court should instead look to Brand's withdrawals up to June 25, 2010. This argument is not supported by the evidence. Appellants point to no evidence offered during the numerous hearings on this matter which delineate Brand's withdrawals up to June 25 and how such evidence paints a different picture than the findings drawn from the end of year returns. Instead, Appellants fall back on the assertion that Brand's state of mind must have been that he could not afford to pay Brooks and Flory. As discussed above, Appellants have not shown that the Bankruptcy Court's findings on Brand's state of mind about the financial resources available to him were clearly erroneous.

With respect to question five, the Bankruptcy Court admits to relying "more on circumstantial evidence and the inferences drawn from it" to reach its conclusions. *Id.* at 214. Nevertheless, the Bankruptcy Court's findings are not clearly erroneous. As a licensed real estate agent, Brand participated in numerous real estate transactions which included deeds of

trust, including those during the first phase of Starlight's real estate venture. *Id.* at 215. Brand was also familiar with the requirement to obtain a release from the deed-holder before selling a property encumbered by a deed of trust because many of the original Starlight properties were sold at short sale while subject to deeds of trust held by the mortgagor banks. *Id.* Brand never asked Starlight investors in either phase of the venture to consent to a sale as would have been required if they had a proper deed of trust in the property. *Id.* While Appellants also allege that Brand intended to form a security interest over all of Starlight's funds, the Bankruptcy Court found that Brand "paid Brooks and Flory their monthly settlement payments from those very funds." *Id.* at 195. This conduct is inconsistent with his previous claims regarding the encumbrance of the funds. For these reasons, the Court finds the Bankruptcy Court's findings on question five sufficient to show that Brand's knew or should have known that the security agreements with the new lenders did not give them priority over Brooks and Flory with respect to the disposition of the property. Furthermore, the Court agrees with the Bankruptcy Court's finding that even if Appellants' arguments were accepted on this question, "it would merely change the actual fraud to constructive fraud which would also vitiate the settlement agreement." *Id.* at 203.

## V. Order

For the foregoing reasons, the Court AFFIRMS the Order of the Bankruptcy Court. An appropriate Order will issue.

September 6, 2016
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

9